## IN THE CIRCUIT COURT OF BALTIMORE CITY, MARYLAND

**DERICK WILLIAMS**
9613 Rose View Court
Upper Marlboro, MD  20772-4866

        **Plaintiff,**

**v.**

**BANK OF AMERICA, N.A.**
**Serve On:**
The Corporation Trust Incorporated,
    Resident Agent
351 West Camden Street
Baltimore, MD 21201

And

**BANK OF  NEW YORK MELLON, N.A.**
**Serve On:**
The Corporation Trust Incorporated,
    Resident Agent
351 West Camden Street
Baltimore, MD 21201

And

**SPECIALIZED LOAN SERVICING, LLC**
**Serve on:**
Capitol Corporate Services, Inc., Resident
Agent
6600 Rockledge Drive Suite 410
Bethesda, MD 20817

        **Defendants**

Case No. _____


## COMPLAINT
### &
## REQUEST FOR TRIAL BY JURY

1

Plaintiff Derick Williams, by his attorneys, Phillip Robinson and Legg Law Firm LLC, hereby files this Complaint against Defendants Bank of America, N.A. ("BOA"), Bank of New York Mellon, N.A.("NY Mellon"), and Specialized Loan Servicing, LLC("SLS")(collectively "Defendants"), and states as follows:

## I. INTRODUCTION

1. The underlying matter involves just one hundreds of other similar situations across the State where, through no fault of their own, homeowners are at risk of foreclosure due to the unsafe and unsound practices of their mortgage servicers. In these instances, such as the underlying matter, the servicers place their interest above that of the homeowner and also the owner of the loan by defaulting the homeowner with a bogus default.

2. These practices are compounded when homeowners try in good faith to resolve the situation in good faith but the servicer does not even respond in good faith. After ignoring these efforts, homeowners like the Plaintiff are left with no other option but to seek the assistance of the Courts. To add insult to injury, many servicers implemented bogus signature practices to fast track foreclosures, like the underlying matter, without regard to the integrity of the judicial system and basic due process.

3. These claims concern the utter failure of Defendant Bank of America, NA ("BOA") and its predecessor mortgage servicer and subsidiary, BAC Home Loans Servicing, LP, by failing to honor the loan terms entered into by the Plaintiff which did not require an escrow account and unfairly and deceptively defaulting the

loan by establishing an escrow account when the Plaintiff was current, had never missed a payment, always made his insurance and property tax payments.

4. Many, but not all, Maryland homeowners facing foreclosure have reasonable and sustainable solutions to their mortgage situation. Mr. Williams does have a sustainable solution if BOA would just accept his regular loan payment and not require the escrow payment; eliminate all the late fees, and other charges it wrongly assessed to Mr. Williams' loan.

5. Further, if the Defendants and their authorized agents proceed to foreclosure sale of Mr. William's home and property, Mr. Williams will sustain significantly greater economic damages and losses as a result through further loss of his home, emotional damages as a result of those proceedings and the Defendants' actions (directly and indirectly through their authorized agents and affiliates).

## JURISDICTION AND VENUE

6. This Court has jurisdiction asserted because Defendants transact business and performs work, own real property, and provide services in Maryland.

7. Venue is appropriate in this district because the Defendants conduct business within Baltimore City, Maryland directly and indirectly through referral their partners and agent who practice in this jurisdiction on their behalf.

## PARTIES

8. Plaintiff Derick Williams ("Mr. Williams") is a resident of the State of Maryland and the owner of the real property commonly known as 9613 Rose View Court, Upper Marlboro, MD  20772-4866 ("the Property").

3

9. Defendant Bank of America, N.A. ("BOA") is a mortgage lender and servicer, headquartered in Charlotte, NC, that regularly conducts business in Maryland, and previously serviced Mr. Williams' mortgage on behalf of Defendant NY Mellon from July 1, 2011 through December 31, 2011.   BOA is also the successor in interest to BAC Loan Servicing, LP, with which it merged as of July 1, 2011 and accepted the servicing rights of Mr. Williams' loan on July 1, 2011.

10. Defendant Bank of New York Mellon, NA ("NY Mellon") is a New York corporation which acquired the ownership rights of Mr. Williams' loan on March 23, 2011.  NY Mellon authorized BOA and BAC Loan Servicing, LP to act on its behalf related to the acts alleged herein and is liable to Mr. Williams for the unfair and deceptive acts and practices alleged herein.

11. Defendant Specialized Loan Servicing, LLC is a Delaware limited liability company which acquired the ownership rights of Mr. Williams' loan on or about January 1, 2012 and is presently serving the loan on behalf of NY Mellon.

12. Not a party to this action, BAC Loan Servicing, LLP ("BAC") was a mortgage servicing company wholly owned by Defendant Bank of America, N.A., that, until July 1, 2011, conducted business in Maryland and serviced Mr. Williams' mortgage on behalf of NY Mellon.[1]

## FACTS

### A.    THE FORECLOSURE CRISIS

---

[1] Bank of America is liable for the acts of BAC as a successor in interest to BAC. For the sake of clarity, this Complaint will refer to these two entities separately in order to clearly identify exactly which actions were taken by each entity. However, throughout the complaint any references to BAC also pertain to BOA as successor in interest to BAC.

13. Over the last four years, Maryland and the United States have been in the midst of a foreclosure crisis. Recent news reports have established that one in ten American homes is at risk of foreclosure.

14. The number of Maryland properties with foreclosure filings has increased substantially throughout the last five years.

15. Increased foreclosures have a detrimental effect not just on the borrowers through damage to credit and reputation and the emotional strain caused by the fear of losing a unique property and the prospect of homelessness, but also on the surrounding neighborhoods that suffer decreased property values and local and state governments that lose tax revenue.

16. The foreclosure crisis is not over. Economists predict that interest rate resets on the riskiest lending products will not reach their zenith until sometime in 2012 or beyond.

17. Since the commencement of the crisis, revelations of massive disorganization in the servicing of residential loans – including lost paperwork, unsatisfactory customer service, and "dual track" loss mitigation programs where lenders were simultaneously negotiating loan modifications for borrowers and proceeding to foreclosure on those borrowers homes – as well as the disclosure of the industry-wide practice of bogus, false and deceptive "robo-signing" have come to light.

**B.    MARYLAND'S RESPONSE TO THE FORECLOSURE CRISIS**

18. In 2007, at the beginning of the crisis, Governor O'Malley convened a task force of representatives to address the crisis that was then underway.  The Maryland

Homeownership Preservation Task Force produced a report which aptly summarized the devastating effect of foreclosures on the community as follows:

> Foreclosures have a devastating effect on homeowners and the communities in which they live. Frequently, a homeowner who loses his or her home to foreclosure loses the accrued equity. A property sold in a foreclosure sale typically draws a lower price than it would in a regular market sale. In the first half of 2005, Maryland's "foreclosure discount" was 18.8 percent, according to the St. Ambrose Housing Aid Center, Inc. This is a tragedy for a growing number of Maryland families.

> Extensive damage is felt in neighborhoods and communities across Maryland. Research shows that with every foreclosure on a single family home, the value of homes within an eighth of a mile declines by about nine-tenths of a percent. Property tax revenues decline proportionally, causing a negative impact on state and local governments. A study of foreclosures in Chicago in 2005 estimated that a single foreclosure costs city government up to $5,000 or more.

> Foreclosures also bring with them the potential for more violent crime. Research indicates that for every single percentage point increase in the foreclosure rate in a neighborhood, violent crime in that neighborhood increases by about two percent. Foreclosures can lead to vacant or neglected properties, which create an eyesore and become targets for vandalism. This can tip a community from one dominated by homeowners to one dominated by investors.

> Of course, the lending industry and investors also take a hit from rising foreclosure rates. Some major lenders have closed their doors, declared bankruptcy or shuttered their subprime lending arms as a result of the waning demand for risky mortgage products in investor markets. Lenders typically lose $50,000 or more on a single foreclosure, according to information from St. Ambrose Housing Aid Center, Inc. The banking industry cites a figure well over $60,000.

Maryland Homeownership Preservation Task Force Report at 12 (November 29,

2007) *available at*

http://www.gov.state.md.us/documents/HomePreservationReport.pdf (footnotes

omitted).

18. To reasonably address and avoid some of the negative consequences of

foreclosure, the Task Force Report made nine general recommendations that are

relevant to the issues before the Court. *See Id.* at 40-43. Included among these

was a specific recommendation, which included the adoption of a good faith and

fair dealing standard of care for Maryland licensed mortgage entities such as the

Defendant. *Id.* (recommendation 7.3).

19. In response to the expanding foreclosure crisis and the Task Force Report, the

General Assembly introduced and passed several bills during the 2008 legislative

session to change Maryland's foreclosure process and curb certain predatory

real estate processes. These bills were passed with nearly complete bi-partisan

support. As summarized in the General Assembly's 90 Day Report for the 2008

session:

> Until [2008], Maryland's foreclosure process, from the first
> foreclosure filing to final sale, had been among the shortest in the
> nation. Maryland is a quasi-judicial State, meaning that the
> authority for a foreclosure sale is derived from the mortgage or
> deed of trust, but a court has oversight over the foreclosure sale
> process. Most mortgages or deeds of trust include a "power of
> sale" (a provision authorizing a foreclosure sale of the property
> after a default) or an "assent to decree" (a provision declaring an
> assent to the entry of an order for a foreclosure sale after a
> default). Under the Maryland Rules, it was not necessary to serve
> process or hold a hearing prior to a foreclosure sale pursuant to a
> power of sale or an assent to a decree. Consumer advocates
> contended that the short timeframes and weak notice provisions in

7

State law seriously limited a homeowner's options to avoid foreclosure by, for example, working out a payment plan with the lender or selling the house. In addition, filing a request for an injunction to stop the sale is expensive, time consuming, and not a realistic option for most homeowners.

**Senate Bill 216 (Ch. 1)/House Bill 365 (Ch. 2)**, emergency legislation that took effect April 4, 2008, make a number of significant changes to the foreclosure process in Maryland for residential real property. "Residential property" is defined under the Acts to mean real property improved by four or fewer single-family dwelling units. Except under specified circumstances, the Acts prohibit the filing of an action to foreclose a mortgage or deed of trust on residential property until the later of 90 days after a default in a condition on which the mortgage or deed of trust states that a sale may be made or 45 days after the notice of intent to foreclose required under the Acts is sent.

. . ...

**Senate Bill 217/House Bill 360** define "mortgage fraud" as any action by a person made with the intent to defraud that involves:
• knowingly making, using, or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that it will be relied upon by a mortgage lender, borrower, or any other party to the lending process;
• receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from the aforementioned actions;
• conspiring to violate either of the preceding provisions; or
• filing or causing to be filed in the land records in the county where a residential real property is located any document relating to a mortgage loan that the person knows to contain a deliberate misstatement, misrepresentation, or omission.

Under the Acts, the "mortgage lending process" includes the solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan, as

well as the notarizing of any document in connection with a
mortgage loan.

Md. Dept. of Legislative Services, The 90 Day Report, A Review of the 2008

Legislative Session, F16-18 (April 11, 2008) *available at*

http://mlis.state.md.us/2008rs/90-Day-report/index.htm.

C.     ENFORCEMENT ACTIONS BY THE UNITED STATES OFFICE OF THE COMPTROLLER
       OF THE CURRENCY

20. In the fourth quarter of 2010, in response to widespread allegations of

deficiencies and unsafe or unsound practices in residential servicing, the Office

of the Comptroller of the Currency of the United States of America ("OCC")

conducted on-site reviews of the foreclosure and loss mitigation practices of

fourteen federally regulated mortgage servicers, including Bank of America. *See*

Interagency Review of Foreclosure Policies and Practices (April 2011), at 1,

*available at:* http://occ.treas.gov/news-issuances/news-releases/2011/nr-occ-

2011-47a.pdf.

21. On April 13, 2011, as a result of those reviews, the OCC announced, that it had

taken "formal enforcement actions against eight national bank mortgage

servicers and two third-party servicer providers for unsafe and unsound practices

related to residential mortgage loan servicing and foreclosure processing." Bank

of America was one of those servicers. *See* Press Release, Office of the

Comptroller of the Currency, OCC Takes Enforcement Action Against Eight

Servicers for Unsafe and Unsound Foreclosure Practices (Apr. 13, 2011)

*available at:* http://occ.treas.gov/news-issuances/news-releases/2011/nr-occ-

2011-47.html.

22. In resolution of the OCC enforcement action against it, Bank of America entered into a Consent Order with the OCC on April 13, 2011. *See* Consent Order *available at:* http://occ.treas.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf.

23. In the consent order, Bank of America "committed to taking all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound practices identified by the OCC, and to enhance the Bank's residential mortgage servicing and foreclosure processes." Consent Order at 1-2.

24. Among the actions Bank of America agreed to take under the consent order are the following:

[Create a] compliance program to ensure that the mortgage servicing and foreclosure operations, including Loss Mitigation and loan modification, comply with all applicable Legal Requirements, OCC supervisory guidance, and the requirements of this Order are conducted in a safe and sound manner. . . The Compliance Program shall include at a minimum:

…

Appropriate procedures for customers in bankruptcy, including a prohibition of collection of fees in violation of bankruptcy's automatic stay (11 U.S.C. § 362), the discharge injunction (11 U.S.C. § 524), or any applicable court order.

…

Changes or upgrades to …ensure the ongoing accuracy of records for all serviced mortgages.

…

[Measures to] (i) ensure that communications are timely and effective and are designed to avoid confusion to borrowers; (ii) to ensure continuity in the handling of borrowers' loan files during the Loss Mitigation, loan modification, and foreclosure process by personnel knowledgeable about a specific borrower's situation; (iii) to ensure reasonable and good faith efforts, consistent with applicable Legal Requirements, are engaged in Loss Mitigation and foreclosure prevention for delinquent loans.

Consent Order at 7, 10, 18-19.

**D.    BACKGROUND ON THE PLAINTIFF AND FACTS RELATED TO ALL COUNTS**

25. Mr. Williams is employed at the U.S. Department of Housing and Community Development.

26. Through his work at HUD, Mr. Williams has been aware of stories concerning homeowners losing their homes to foreclosure even when they are in the midst of trying to negotiate a loan modification with their servicer or through no fault of their own because of the servicers unsafe, unsound, unfair, and deceptive mortgage servicing practices.

27. On or about February 20, 2007, Mr. Williams refinanced his then present Countrywide mortgage on the Property with Countrywide Home Loans.

28. The February 20, 2007 settlement was conducted by Skyline Title Company, Inc. As part of the transaction Mr. Williams agreed to several documents including:

   a. A Deed of Trust which identifies a corporation, i.e. Samuel I. White, P.C., as the "Trustee"

   b. A Note in which Mr. Williams borrowed $345,800 at the fixed rate of 6.875% over thirty years which equaled a monthly payment of $2,271.66.

29. Beginning with his May 2008 payment (made on or about April 25, 2008), Mr. Williams no longer made his escrow payments by agreement with his mortgage servicer, i.e. Countrywide Home Loans Inc., at the time. Countrywide and Mr. Williams had come to this agreement since Countrywide was having difficulties estimating the sum due through it faulty estimates.

30. As part of his agreement with Countrywide, Mr. Williams elected to make an annual tax payment to the Prince George's County tax assessment and collection office and did in fact do so.

31. However, unknown to Mr. Williams, BAC made semi-annual payments to the Prince George's County tax assessment and collection office before the payment was actually due. Mr. Williams did not learn of the semi-annual payments by BAC until he infact attempted to make the annual payment himself.

32. For some unknown and unexplained reason, BAC improperly paid Mr. Williams' tax payments to Prince George's County, Maryland on or about April 15, 2010 and September 14, 2010 when the payments were in fact not due and Mr. Williams had not failed to make the payments as required by Prince George's County. As a result of BAC making these improper and unauthorized payments, it also knowingly assessed Mr. Williams' mortgage account with hundreds of dollars of late fees.

33. After April 15, 2010 and September 14, 2010, BAC knowingly and willfully made multiple other omissions and misapplications of Mr. Williams' regular, monthly payments. These included (but are not limited to) the following:

    a. "Misc. Postings" on June 28, 2010, July 29, 2010, August 3, 2010, December 23, 2010, January 3, 2011, February 1, 2011, February 28, 2011, and April 14, 2011;

    b. "Escrow Shortgage" on December 23, 2010; and

    c. "Payment Reversal" on February 1, 2011

34. On April 16, 2011 BAC provided Mr. Williams with a purported loan history of his loan from January 2007 through April 2007. This loan history is an admission by BAC of the facts alleged above.

35. On July 27, 2011, BOA refused to accept Mr. Williams' timely and correct monthly payment of $2271.66 stating that he did not make the necessary escrow payment even though BAC had agreed to not require and escrow on his account.

36. In response to the return of his payment described in the preceding paragraph, Mr. Williams contacted BOA in good faith to resolve the situation on August 1, 2011 but the BOA's representatives refused to discuss the escrow situation and instead referred Mr. Williams to the loan modification department.

37. On August 23, 2011, BOA falsely stated to him that his timely and correct payment of $2271.66 made for May 2011 was not correct and therefore it was returning to Mr. Williams his payment of $2,271.66. BOA also falsely represented to Mr. Williams that it wished to help him to maintain his dream of homeownership.

38. On September 1, 2011, BOA accepted Mr. Williams' timely and correct monthly payment of $2271.66 but falsely claimed in writing that it "was less than the total amount needed to bring your loan up to date." This statement was false because it was not an accurate representation of the valid agreement made by Countrywide and Mr. Williams as described in ¶¶ 29-30.

39. On September 16, 2011, BOA accepted Mr. Williams' timely and correct monthly payment of $2271.66 but falsely claimed in writing that it "was less than the total amount needed to bring your loan up to date." This statement was false because

It was not an accurate representation of the valid agreement made by Countrywide and Mr. Williams as described in ¶¶ 29-30.

40. On October 13, 2011, BOA accepted Mr. Williams' timely and correct monthly payment of $2271.66 but falsely claimed in writing that it "was less than the total amount needed to bring your loan up to date." This statement was false because it was not an accurate representation of the valid agreement made Countrywide and Mr. Williams as described in ¶¶ 29-30.

41. On November 3, 2011 BOA sent Mr. Williams a false and deceptive Notice of Intent to Foreclose which falsely stated the name of the secured party to Mr. Williams' loan, the date of default and amount necessary to cure his loan among the several omissions and deceptive and unfair statements.

42. In the November 3, 2011 BOA threatened to commence a foreclosure against Mr. Williams and his Property.

43. On November 23, 2011, BOA wrote to Mr. Williams and stated that it would accept his timely and correct monthly payment of $2271.66 but that sum was not amount necessary "to bring [Mr. Williams'] loan up to date." This statement was false because it was not an accurate representation of the valid agreement made by Countrywide and Mr. Williams as described in ¶¶ 29-30.

44. BOA also made several unfair and deceptive statements in its November 23, 2011 correspondence to Mr. Williams including:

   a. "We want to help you avoid foreclosure."

14

    b. If he did not make the payment claimed to be due by BOA "needed to

       reinstate [his] loan" by December 18m 2011, "foreclosure proceedings

       may begin or continue."

45. Upon information and belief, based upon the above pattern of

misrepresentations, omissions, and similar acts BOA has continued BAC's

pattern of misapplying Mr. Williams'' payments, assessing improper late fees,

and similar costs to Mr. Williams' mortgage account forcing him towards

foreclosure.

46. BAC's and BOA's pattern of misapplication of fees and costs related to the

improper reinstitution of an escrow account on the loan after Countrywide had

agreed to not require an account has harmed and damaged Mr. Williams by

causing an otherwise unnecessary default on his mortgage loan which has been

reported to the credit bureaus and further damaged his credit.

47. While Mr. Williams attempted in good faith to resolve this situation, BAC and

BOA failed to do so.  And to add insult to injury, BOA has now transferred Mr.

Williams' loan to SLS effective January 1, 2012 with the same faulty accounting it

had been reporting, omitting, and misrepresenting for more than a year now.

48. As a result of the actions of BAC and BOA, Mr. Williams has been living in fear,

despite his best efforts, each day that he will lose his home to foreclosure.

49. Mr. Williams has also experienced irritability and a withdrawal of socialization as

result of the actions of BAC and BOA

**COUNT I**
**VIOLATION OF THE FAIR DEBT COLLECTION PRACTICE ACT,**
**15 U.S.C. § 1692, et seq.**
**(Against Bank of America, NA and Bank of New York Mellon, NA)**

15

50. Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

51. Defendant BOA and NY Mellon acquired the servicing and ownership rights to Mr. Williams' mortgage during a period in which both BAC and BOA allege the loan was in default and BOA and NY Mellon are therefore a "Debt Collectors" within the meaning of 15 U.S.C. § 1692a(6).

52. By sending false, deceptive, and misleading communications claiming that Mr. Williams was in default, that the payments he made are not sufficient to cover the amount of their monthly payments, and requesting that Mr. Williams submit documentation to be considered for a loan modification, BOA was in violation of 15 U.S.C. § 1692e.

53. BAC and BOA's repeated attempts to collect non-existent past-due amounts and fees and interest on those amounts constitute unfair or deceptive practices in violation of 15 U.S.C. § 1692f.

54. Defendant NY Mellon is liable for the unfair acts described herein of its authorized agents BAC and BOA and since it acquired the debt of Mr. Williams at a time when it believed the debt was in default.

55. Plaintiff has suffered actual economic and non-economic damages, as more fully described in Paragraphs 3-5, 32-33, 45-49, and has incurred attorney's fees and court costs as a result of Defendants' BOA and NY Mellon's direct and indirect conduct.

56. The FDCPA provides for statutory damages in addition to actual damages.

WHEREFORE, Plaintiff respectfully requests the Court enter judgment in favor of Plaintiff and against the Defendants BOA and NY Mellon for: actual damages in an amount not less than $20,000; statutory damages in the amount of $1,000; costs and attorney's fees incurred by Plaintiff; and grant Plaintiff such other and further relief as this court finds necessary and proper.

## COUNT II
### VIOLATION MARYLAND'S CONSUMER PROTECTION ACT,
### Md. Code Ann., Com. Law §13-101 et seq.
### (Against Bank of America, NA and Bank of New York Mellon, NA)

57. Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

58. BOA, as the parent company of BAC, is liable as a principal for the actions of its agent BAC in this matter.

59. NY Mellon, as the principal of its authorized mortgage servicers BOA and BAC, is liable for the actions of BOA and BAC in this matter.

60. BOA is also liable for the actions of BAC as the successor in interest to BAC.

61. The mortgage loan servicing and transactions of BOA and NY Mellon, as set forth herein, are governed by the Consumer Protection Act, Md. Code Ann., Com. Law. § 13-101, et. seq.

62. Section 13-303 prohibits unfair or deceptive trade practices in the extension of consumer credit or collection of consumer debts. The communications sent by BAC and BOA to Plaintiff claiming that Plaintiff was in default on his mortgage involve both the extension of credit and the collection of debts.

63. The Maryland Consumer Protection Act defines unfair or deceptive trade practices to include, inter alia, the following: (a) False, falsely disparaging, or

misleading oral or written statement, visual description or other representation of

any kind which has the capacity, tendency or effect of deceiving or misleading

consumers; and (b) Failure to state a material fact if the failure deceives or tends

to deceive.

64. By engaging in the acts and omissions set forth above, and by making the

misrepresentations set forth above, and by failing to disclose material facts

where the failure to do so deceived or tended to deceive, the BAC and BOA have

committed unlawful or deceptive trade practices in violation of the Maryland

Consumer Protection Act. Sec. 13-301(1) and (3) and Sec. 13-303(4).

65. BOA and BAC's conduct, as set forth above, had the capacity, tendency or effect

of deceiving Mr. Williams, who has suffered economic and non-economic

damages (including emotional distress and mental anguish), as described in

Paragraphs 3-5, 32-33, 45-49.

WHEREFORE, Plaintiff respectfully requests the Court enter judgment in favor of

Plaintiff and against Defendants Bank of America, NA and Bank of New York Mellon,

NA for: actual damages of not less than $20,000; costs and attorney's fees incurred by

Plaintiffs; and grant Plaintiffs such other and further relief as this court finds necessary

and proper.

### COUNT III
#### VIOLATION OF THE MARYLAND CONSUMER DEBT COLLECTION ACT,
#### Md. Code Ann., Com. Law §§ 14-201, et seq.
#### (Against Bank of America, NA and Bank of New York Mellon, NA)

66. Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

67. BOA, as the parent company of BAC, is liable as a principal for the actions of its

agent BAC in this matter.

68. NY Mellon, as the principal of its authorized mortgage servicers BOA and BAC, is liable for the actions of BOA and BAC in this matter.

69. BOA is also liable for the actions of BAC as the successor in interest to BAC.

70. BAC, BOA, and NY Mellon have attempted to collect a debt arising from a mortgage on the Plaintiff's primary residence and are thus "collectors" within the meaning of the Maryland Consumer Debt Collection Act, Md. Code Ann., Com. Law § 14-201 (b).

71. BAC, BOA, and NY Mellon have continued to refuse to honor Countrywide's agreement with Mr. Williams not to require an escrow account with his mortgage loan and have as a result of that agreement sought to collect sums they were not otherwise entitled to collect.

72. The notices sent by BAC and BOA claiming the Plaintiff owes over $10,000 in arrearages are attempts to enforce a right or collect a debt which BAC, BOA, and NY Mellon know does not exist.

73. As a result of Defendants BOA and NY Mellon's actions, Plaintiff has suffered economic and noneconomic damages, as described more fully in Paragraphs 3-5, 32-33, 45-49.

WHEREFORE, Plaintiff respectfully requests the Court enter judgment in favor of Plaintiff and against Defendants Bank of America, NA and Bank of New York Mellon, NA for: actual damages of not less than $20,000; costs and attorney's fees incurred by Plaintiff; and grant Plaintiff such other and further relief as this court finds necessary and proper.

## COUNT IV
### VIOLATION OF THE MARYLAND MORTGAGE FRAUD ACT,
### Md. Code Ann., Real Prop. §§ 7-401, et seq.
### (Against Bank of America, NA and Bank of New York Mellon, NA)

74. Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

75. BOA, as the parent company of BAC, is liable as a principal for the actions of its agent BAC in this matter.

76. NY Mellon, as the principal of its authorized mortgage servicers BOA and BAC, is liable for the actions of BOA and BAC in this matter.

77. BOA is also liable for the actions of BAC as the successor in interest to BAC.

78. The Maryland Mortgage Fraud Protection Act ("MMFPA"), Md. Code Ann., Real Prop. § 7-401, et. seq., governs the relationship between Defendants BOA and NY Mellon and the Plaintiff.

79. Md. Code Ann., Real Prop. § 7-401(c) provides: "Homeowner" means a record owner of residential real property. The Plaintiffs are record owners of the residential property in question and are therefore Homeowners.

80. Md. Code Ann., Real Prop. § 7-401(e) provides: "Mortgage lending process... include [t]he... servicing... of a mortgage loan."

81. Md. Ann. Code, Fin. Inst. § 11-501(l) provides: "Mortgage loan" means any loan or other extension of credit that is: (i) secured, in whole or in part, by any interest in residential real property in Maryland; and (ii) for personal household or family purposes, in any amount.

82. The MMFPA works to protect the interests of all parties to mortgage transactions in Maryland from misstatements, misrepresentations and omissions. In this

instance, the MMFPA works to protect borrowers like Mr. Williams from mortgage companies like Defendants BOA and NY Mellon and ensure a level, fair playing field between all borrowers and professionals.

83. The Plaintiff is a homeowner in the Mortgage Lending Process as defined by the MMFPA since the actions in dispute in this lawsuit involve the servicing of his residential mortgage loan and the attempts to collect a non-existent "past-due" arrearage.

84. Md. Code Ann., Real Prop. § 7-401(d) provides:

"Mortgage fraud" means any action by a person made with the intent to defraud that involves:
1. Knowingly making any deliberate misstatement, misrepresentation or omission during the mortgage lending process with the intent that the misstatement, misrepresentation or omission be relied on by a mortgage lender, borrower or any other party to the mortgage lending process;
2. Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process.
3. Receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from a violation of item (1) or (2) of this section;
4. Conspiring to violate any provisions of item (1), (2), or (3) of this section...

85. BAC, BOA, and NY Mellon have committed Mortgage Fraud by knowingly making, as described herein, deliberate misstatements, misrepresentations, and omissions during the mortgage lending process, with the intent that the misstatements, misrepresentations and omissions be relied on by the Plaintiff in the following manner:

a. BAC and BOA knowingly sent Plaintiffs notices that Plaintiff's' mortgage was in default despite the fact that Plaintiff has made all required payments under agreement with Countrywide (¶¶ 29-30).

b. BAC and BOA of America knowingly informed SLS that Plaintiff's mortgage was in arrears even after each had notice from the Plaintiff that there was a dispute related to the account related to this belief but they had failed to investigate and resolve the situation before transferring the loan to SLS.

86. As a result of Defendant BOA's and NY Mellon's (by and through its authorized agents) knowingly deceptive and untrue communications, Plaintiff has suffered economic and noneconomic damages, as described more fully in Paragraphs 3-5, 32-33, 45-49, and incurred court costs and attorney's fees.

WHEREFORE, Plaintiff respectfully request the Court enter judgment in favor of Plaintiff and against Defendants Bank of America, NA and Bank of New York Mellon, NA for: actual damages of not less than $10,000; treble damages against the Defendants for their willful and knowing violations pursuant to Md. Code Ann., Real Prop. § 7-406(c) at the discretion of the Court, costs and attorney's fees incurred by Plaintiffs; and grant Plaintiffs such other and further relief as this court finds necessary and proper.

## COUNT VI
### DECLARATORY AND INJUNCTIVE RELIEF
### (Against Bank of New York Mellon, NA and Specialized Loan Servicing, LLC)

87. Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

88. NY Mellon, as the principal of its authorized mortgage servicers BOA and BAC, is liable for the actions of BOA and BAC in this matter.

89. Plaintiff seeks a declaration of his rights with respect to the status of his mortgage and account with SLS and NY Mellon that the loan is current.

90. An actual controversy exists as to the true amount owed by Plaintiff to Defendants NY Mellon and SLS and the correct amount of their monthly payments under the terms of the modified mortgage agreement.

91. Declaratory relief is appropriate pursuant to Md. Code Ann. and Cts. & Jud. Pro. §§ 3-401 to 3-415.

92. Plaintiffs are entitled to an injunction since the actions of NY Mellon and its agents are improper and illegal.

93. The public interest is served by enjoining Defendants NY Mellon and SLS from continuing to violate Maryland law.

94. The Plaintiff will suffer irreparable harm if Defendants NY Mellon and SLS are not enjoined.

95. The burden imposed on Defendants NY Mellon and SLS by requiring them to comply with Maryland laws and regulations concerning the servicing of mortgage loans is substantially outweighed by the harm suffered by Plaintiff by allowing Defendants to ignore Maryland law.

WHEREFORE, Plaintiff respectfully requests the Court order appropriate injunctive relief to rectify past violations of law and prevent further violations of law; including a temporary restraining order, preliminary and permanent injunction on any attempts to collect the arrearages Defendants Bank of New York Mellon, NA and Specialized Loan Servicing, LLC falsely claim they are

owed through foreclosure proceedings or other processes; and order other appropriate declaratory relief.

Respectfully Submitted,

Phillip Robinson
Legg Law Firm, LLC
5500 Buckeystown Pike
Frederick MD 21703
Phone: (301) 620-1016
Email: probinson@legglaw.com

*Attorneys for Plaintiffs*

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial on all claims and disputed facts herein.

Phillip Robinson